IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

**SCOTTY OWENS**                                                                                       **PLAINTIFF**

**v.**                                                   **CIVIL ACTION NO.: 1:24-cv-67-JMV**

**COMMISSIONER OF SOCIAL SECURITY**                           **DEFENDANT**

**ORDER**

On March 8, 2021, Plaintiff filed an application for Title II Social Security disability insurance benefits, alleging disability beginning October 16, 2017.[1] The application was denied both initially and on reconsideration. Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and on September 26, 2023, ALJ Roger Lott held a hearing. On October 5, 2023, the ALJ issued an unfavorable decision.

Subsequently, Plaintiff requested review from the Appeals Council. On February 13, 2024, the Appeals Council declined review, thus making the ALJ's decision the final decision of the Commissioner of Social Security. For the reasons that follow, the undersigned finds that the ALJ's decision shall be AFFIRMED.

**The Case Below:**

Plaintiff's last date insured was December 31, 2022, and he was fifty-three years old at the time his insured status expired. Tr. 17, 181. He had past relevant work as a furniture assembler, DOT 763.684-038, medium exertional level with a 4 SVP, which is semi-skilled, but the testimony indicated the job was performed at very heavy. Tr. 56. At step one, the ALJ found that Plaintiff had not engaged in SGA during the period from his alleged onset date of September 13, 2020, through the date last insured of December 31, 2022. Tr. 11.

---

[1] Plaintiff later amended the alleged onset date to September 13, 2020. Tr. 30.

1

At step two, the ALJ determined that Plaintiff's severe medical impairments were osteoarthritis of the bilateral hands, disorders of the bilateral shoulders, and obesity. Tr. 11. The ALJ noted that while the record documented complaints of or references to panic disorder and calcaneal spurs of the bilateral feet, neither the record nor Plaintiff's testimony established functional limitations in conjunction with these medical conditions. The issue presented involves a question of whether the medical conditions involving Plaintiff's feet are "severe," so the summary herein will mainly highlight treatment involving the feet.

On March 14, 2022, Premier Radiology performed bilateral x-rays on Plaintiff's ankles. The reason for the exam was "bone spurs on both ankles." Tr. 429. After reviewing the x-rays, Dr. Edmondson, concluded:

> There is small plantar calcaneal spur bilaterally. There is otherwise no definite focal or acute abnormalities with limitation . . . Ankle Ankle mortise appears maintained. Impression: Small bilateral plantar calcaneal spurs without focal or acute abnormality.

Tr. 429.

On March 19, 2022, Plaintiff presented to EverMed Exams in Starkville, Mississippi, where he reported a history of bone spurs on both ankles starting two years prior caused by excess use. Tr. 431. His current symptom was pain, worsened by walking and standing, and improved with rest. He also complained of arthritis in his hands, shoulders, feet, and ankles. The examination revealed that the claimant had an unremarkable physical examination and demonstrated "normal gait and normal strength and grossly normal range of motion." Tr. 436. He was given "no limitations with sitting, standing, or walking. The claimant does not need an assistive device with regard to short and long distances and uneven terrain." *Id.*

On October 9, 2022, Plaintiff presented to the ER complaining of "ankle/heel pain after stepping in a hole last night." Tr. 477. An x-ray was performed of Plaintiff's left ankle which

2

revealed a "bone spur on calcaneus." Plaintiff was discharged on diclofenac and placed in a walking boot. Tr. 480.

On October 17, 2022, Plaintiff presented to Mitias Orthopaedics where he reported arthralgias/joint pain in his left ankle/foot. He reported that it "began worsening 2 weeks ago when he stepped in a hole. Prior to that, he had no issues with his heel." Tr. 542. He was assessed with plantar fasciitis of the left foot, pain in left foot, and overweight. Tr. 543. Alexander Hill, CNP noted in his discussion notes that "[h]is x-rays from the emergency room are unimpressive other than a tiny heel spur." Tr. 543. CNP Hill printed Plaintiff home exercises. *Id.* He was not wearing his boot from the emergency room because he reported that it irritated the anterior tibia. *Id.* He received an intramuscular injection of Toradol and was prescribed Toradol by mouth. *Id.*

On January 13, 2023, Plaintiff saw Dr. Foropoulos, who diagnosed Plaintiff with plantar fasciitis. At the visit, Plaintiff received a heel injection and a prescription for a night split. Plaintiff reported heel pain since October 2022, and stated that he really did not get any better and has gotten worse over the past few weeks. He reported that he has gone back to wearing the walking boot. On exam of the left lower extremity, he had a good range of motion of the hip, knee, and ankle. He was tender over the medial edge of the calcaneus and had pain with hyper-dorsiflexion of the toes. He had a little tenderness over the Achilles tendon and mild discomfort with medial and lateral compression of the heel. Tr. 544. The x-ray revealed a bone spur off the medical edge of the calcaneus with no fracture. Tr. 544.

Lastly, on April 14, 2023, Plaintiff presented to Dr. Foropoulos complaining of right ankle pain. Plaintiff reported a "two-week history of right ankle pain," which "started when he was out using a metal detector." Tr. 545. "He did a lot of walking for about five days in a row and his ankle began to hurt. It hurts him to turn it out, it hurts him to turn it in, it hurts when his shoe rubs on it,

and it hurts to stand." Tr. 545. Plaintiff was prescribed a Medrol Dosepak and given a stretching program to do. Dr. Foropoulos reported that Plaintiff was wearing shoes that lace up, and he thought those would work for his underlying tendonitis. Tr. 545. X-rays "did not show any bony fracture and joint space maintained." Diagnoses were "mild DJD of the ankle" and "peroneal tendinitis." Tr. 545.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a Listing. The ALJ found the Plaintiff has the residual functional capacity to perform a modified range of light work, as follows:

> Light work as defined in 20 CFR 404.1567(b) except the claimant can lift/carry twenty pounds occasionally and ten pounds frequently. The claimant can stand/walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday. He can never climb ladders, ropes, and scaffolds. the claimant can occasionally crouch, kneel, and crawl. The claimant can frequently handle, finger, and feel with both hands. he can frequently reach overhead with both arms. Additionally, he should avoid unprotected heights.

Tr. 13.

At Step 4, the ALJ found that through the date last insured, Plaintiff was unable to perform any past relevant work. Tr. 15. At step five, the ALJ found that Plaintiff could perform other work that existed in significant numbers in the national economy: linen grader (D.O.T.#361.6887-022), a light unskilled job with 118,000 such positions in the national economy; a ferment sorter (D.O.T # 222.687-014), a light unskilled job with 96,000 such positions in the national economy, and as a garment bagger (D.O.T. #920.687-018), an unskilled light job with 73,000 such positions in the national economy. Tr. 16-17. Therefore, the ALJ found that Plaintiff was not disabled from October 16, 2017, the alleged onset date, through December 31, 2022, the date last insured. Tr. 17.

**Issue on Appeal:**

Plaintiff alleges that the ALJ incorrectly determined that the conditions involving his feet did not rise to the level of a severe impairment.

**Standard of Review, Law, and Analysis:**

It is long established that this Court's review of the Commissioner's final decision that Plaintiff was not disabled is limited to two inquiries: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards. *See* 42 U.S.C. § 405(g); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). When substantial evidence supports the Commissioner's findings, they are conclusive and must be affirmed. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Supreme Court explained:

> The phrase substantial evidence is a term of art used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence…is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations and internal quotations and brackets omitted).

In applying the substantial evidence standard, the Court "may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute [the Court's] judgment for the Commissioner's], even if the evidence preponderates against the [Commissioner's] decision." *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. *See Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

5

The claimant has the burden of proof at the first four steps of the sequential evaluation process. *See Greenspan*, 38 F.3d at 236. At step five, the Commissioner has the burden to produce evidence about the existence of work in the national economy. *See* 20 C.F.R. § 404.1512(b)(3). Once the Commissioner shows that a claimant's RFC and vocational profile would allow performing a significant number of jobs in the national economy, the burden shifts to the claimant to rebut this finding. *See Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).

As relevant to this case, a severe impairment is an impairment that significantly limits a claimant's physical or mental abilities to do basic work activities. 20 C.F.R. § 404.1520(c); 20 C.F.R. § 404.1521(a) (defining a non-severe impairment). A severe impairment must last for a continuous period of at least twelve months. 20 C.F.R. §§ 404.1505(a); 404.1509; 404.1520(c); *Barnhart v. Walton*, 535 U.S. 212, 217 (2002). Because an individual is diagnosed with a condition does not mean that the condition would cause limitations that would warrant a finding of a severe impairment. 20 C.F.R. §§ 404.1520(c); 404.1521(a); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis [of a condition], of course, says nothing about the severity of the condition.").

In this case, Plaintiff argues that his testimony at the hearing revealed that "his feet caused him severe problems" and indicated "that he had to walk with a 'limp.'" Pl.'s Br. [12] at 6. Further, Plaintiff argues that "he had problems standing and walking for long periods of time and that the longest period of time that he had walked was in the grocery store with his wife for approximately 30 minutes." *Id.* Plaintiff urges the undersigned to reverse the ALJ's findings because "[d]espite the complaints and medical confirmation, the ALJ did not find the feet to be a 'severe' impairment." *Id.*

In response, the Commissioner argues that the medical evidence did not indicate that Plaintiff's medical conditions related to his feet interfered with his ability to perform basic work-related activities, particularly for a twelve-month period. 20 C.F.R. §§ 404.1520(c), 404.1521; *Lustgarten v. Comm'r of Soc. Sec.*, 794 Fed. Appx. 843, 849 (5th Cir. 2019) (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)) ("[T]he severity of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality."). Comm. Br. [15] at 5. Further, the Commissioner urges the Court that adding these conditions to the list of severe impairments at step two would serve no practical purpose because Plaintiff failed to show that the medical conditions involving his feet caused additional limitations. *Id.* at 6.

Here, I find that Plaintiff has established no legal error. At the telephonic hearing of this matter before the undersigned on November 6, 2024, Plaintiff acknowledged that the ALJ reviewed the evidence and made comments about it; however, Plaintiff felt as if the ALJ minimized the effect of those impairments. Plaintiff is correct that in the ALJ's opinion, he noted that Plaintiff had "received treatment for a number of musculoskeletal impairments." Tr. 13. The ALJ reviewed the March 2022 x-ray scans of both feet, the October 2022 emergency room x-ray findings related to the left heel, the January 2023 radiological scans which found plantar fasciitis, and the April 2023 right ankle scans. Tr. 13-14. The ALJ considered the CE performed by Dr. Jennings, as well as the findings of the state agency consultants. The ALJ found the state agency consultants' opinions to be unpersuasive since the state agency consultants found Plaintiff could perform work activities at the medium exertional level with additional limitations, while the ALJ limited Plaintiff to light work, with additional limitations. Tr. 15. The ALJ also considered the third-party function

report completed by the Plaintiff's mother, but found it to be unpersuasive because it was a "non-critical assessment of the claimant and is not consistent with the objective evidence of record." *Id.*

In addition, the hearing transcript reveals that the ALJ thoroughly questioned Plaintiff regarding any feet impairments. An excerpt from this exchange during the hearing was as follows:

> Q: All right. Now, let's talk a little bit about the physical conditions. Let's start with the problems with your left heel, okay?
>
> A: Okay.
>
> Q: You've testified that it's something that's there and causes problems all the time, that you've had to wear the boot at times, that . . . it's all caused by a big heel spur. But in April of this year, just five months ago, you went to see Magnolia Orthopaedics. You told them that you had about a two-week history of right ankle pain. You said it started when you were out using your metal detector, that you had done a lot of walking for about five days in a row and that your ankle began to hurt, that you had stepped in a hole, and it turned in. So in April of this year, you told your doctor you had been out five days in a row doing a lot of walking with your metal detector. How am I supposed to take that if it's so bad that you got to wear a walking boot and avoid walking for more than 30 minutes because of spurs?
> A: The first time I went is when it – is when my heel problem started. I hadn't had that for years.
>
> Q: Okay. That was in April of '23 about your right ankle was when you went to see them. All right. I'm seeing Mitias Orthopaedics at Exhibit 10F in October of '22. . . . This was your left heel. You went to them then and said that two weeks ago, you had stepped in a hole and hurt your left heel. You mentioned that it came from a large heel spur, but what your doctor says is that your X-rays from the emergency room were unimpressive, other than a tiny heel spur. Majority of the pain appears to be coming from a contusion and strain of your plantar fasica. So essentially, that you had a temporary issue with your foot because you'd stepped in a hole, and that the bone spur is, on the X-ray, tiny. And then again, that was in October of '22. By April of '23, you're back at the doctor telling them that you were out doing five days of a lot of walking with your metal detector and hurt your right foot. So it doesn't sound from the medical records like there was a whole lot restricting your ability to get out and walk during that period.

Tr. 51-52.

Ultimately, after consideration of all of the evidence in the record, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms

8

are not entirely consistent with the medical evidence and other evidence in the record." Tr. 15. Such finding does not constitute reversible error.

**Conclusion:**

In conclusion, I find that the ALJ's opinion is supported by substantial evidence. Accordingly, the ALJ's decision shall be and is hereby AFFIRMED.

**SO ORDERED** this, the 15th day of November, 2024.

/s/ Jane M. Virden
**UNITED STATES MAGISTRATE JUDGE**